# Exhibit F

# COLLEGE PHARMACY

## VS.

## LARIVEE

<u>Deposition</u>

## JERRY S GILLICK

*08/08/2014*

---

*Agren Blando Court Reporting & Video, Inc.*
216 16th Street, Suite 600
Denver Colorado, 80202
303-296-0017

**Page 121**

1  Q  Okay. How often, like once, twice a
2  month?
3  A  Not even that. We would --
4  Q  Once every other month?
5  A  Yeah. There was no set time, but
6  whenever -- whenever we needed to meet or we
7  would -- every few months, or we'd have a chat on
8  the phone or we'd send him some documents and
9  financials, whatever -- whatever he requested, yeah.
10  It was ...
11  Q  Okay. So is it your testimony today that
12  Mr. Stinar, after -- well, let me break it down a
13  little bit.
14      So did you have a meeting with -- did you
15  meet face to face with Mr. Stinar at any time during
16  that time period before Mr. Levis was engaged to
17  discuss Mr. Levis' engagement?
18  A  I truly don't remember when we met or
19  how -- if it were by telephone, I -- all I know is
20  that at some point we got a call from Rob Levis and
21  then we -- must have received an e-mail.
22      We had -- he had to be engaged officially
23  by the trustee, and once that was done then he
24  phoned us, he said he wants to meet us. So that's
25  what happened.

**Page 122**

1       But as far as when all this happened, I
2  can't give you the exact sequence.
3  Q  Well, I'll represent to you -- maybe this
4  will help your memory a little bit. On July 2nd of
5  2010, Mr. Levis sends Mr. Stinar a letter with
6  that -- the evaluation of the company as of
7  December 31st, 2009. Okay?
8  A  The final evaluation or the draft?
9  Q  Well, I don't know. I'll have to ask him
10  what he thought it was, but --
11  A  Okay.
12  Q  -- I --
13  A  Okay.
14  Q  He sent him a valuation of the company --
15  A  Right.
16  Q  -- of the company's value through
17  December 31st, 2009, and he sent that to them on
18  July 2nd, 2010. Okay?
19  A  Okay.
20      MR. ZENDEJAS: Form and foundation.
21  Q  (By Mr. Wiens) So prior to that time
22  period, prior to July 2nd, 2010, when did you meet
23  with Mr. Stinar about Mr. Levis' retention?
24      MR. ZENDEJAS: Form and foundation.
25  A  I don't recall a specific date or if we

**Page 123**

1  met regarding Rob Levis. I don't recall. I don't
2  recall that.
3  Q  (By Mr. Wiens) Okay. You said you
4  received an e-mail that Mr. Levis had been engaged,
5  right?
6  A  Either I received one or Kellie or both of
7  us that Mr. Levis would be calling us to set up a
8  meeting.
9  Q  Okay. And when did that meeting occur?
10  A  I don't have the dates of when -- the
11  meeting. We may have met -- normally we'd meet --
12  have an initial meeting and then there might be like
13  a -- either a follow-up meeting or a phone call to
14  discuss things, or once we got a draft we'd review
15  it and we'd make some suggestions. We'd say, Well,
16  this is incorrect, and then he would make a final
17  document.
18  Q  Right. As part of his preparation of the
19  value --
20  A  Exactly.
21  Q  Hold on. Let me finish just so she
22  doesn't get mad at us.
23  A  Sorry. Sorry.
24  Q  Just as preparation for his valuation, he
25  needed to obtain information from College Pharmacy,

**Page 124**

1  like your accounting and other information for
2  purposes of providing a value of the company, right?
3  A  Correct.
4  Q  And I understand just generally that you
5  or Ms. Plush provided him that information, right?
6  A  Correct.
7  Q  And then he -- did he prepare a draft,
8  then, and sent you the draft and you were able to
9  review that so that you could see if, in fact, he's
10  correctly putting forth your revenues, your losses,
11  that kind of stuff, in his valuation?
12  A  Correct.
13  Q  Okay. And you would have reviewed that
14  draft prior to him actually publishing the final --
15  the final valuation that he sent to Mr. Stinar on
16  July 2nd, correct?
17      MR. ZENDEJAS: Form and foundation.
18  A  Correct.
19  Q  (By Mr. Wiens) And -- okay.
20      And prior to ...
21  A  Excuse me.
22  Q  You got it?
23  A  Yeah.
24      (Pause.)
25  Q  And so fair to say, then, prior to

## Page 125

1  July 2nd, 2010, either by phone or e-mail, maybe you
2  met with him in person, you had communicated to
3  Mr. Levis that you thought he accurately stated
4  everything in his valuation report, correct?
5    A    When --
6         MR. ZENDEJAS: Form and foundation.
7    A    When you say "accurately" --
8    Q    (By Mr. Wiens) Well, that he had depicted
9  whatever statements and opinions that were in his
10 valuation of the company for that period, that those
11 were correct.
12   A    Yes.
13   Q    Okay. You didn't -- so, for example, you
14 didn't identify anything to him where -- well, let
15 me ask, did you identify anything to him that he
16 needed to change in his report?
17   A    There probably were some things, some
18 factual things that we brought up and that he wasn't
19 aware of or ...
20   Q    Okay. So did he talk to you about -- in
21 addition to like the revenues and accounting and,
22 you know, kind of the hard numbers of his valuation,
23 did he talk to you about and interview you about,
24 you know, the company's projections, where you
25 thought the company was going, the factual --

## Page 126

1    A    Yes.
2    Q    -- scenario --
3         I'm sorry.
4    A    Sorry.
5    Q    The facts that would lead up to and
6  support his valuation?
7    A    Yes.
8    Q    The background of the company and its --
9  its business dealings and things of that -- he
10 interviewed you or -- is that correct?
11   A    Yes, that's correct.
12   Q    Did he interview anybody else that you're
13 aware of at College Pharmacy?
14   A    No. It's just myself and Kellie Plush.
15        MR. WIENS: Okay. I know you've got a lot
16 of questions, so I'm going to -- let's take a quick
17 break and then I'm going to review my notes quick
18 and pass the witness to Mr. Torres.
19        (A recess was taken from 1:55 p.m. to
20        2:09 p.m.)
21        MR. TORRES: I don't think I'm going to
22 get finished today, so you guys might be thinking
23 about how we split it up.
24        MS. WHITE: We're willing to stay as long
25 as you need.

## Page 127

1         MR. TORRES: I appreciate that.
2         MS. WHITE: Right.
3         MR. TORRES: But, anyway, I still may not
4  get done.
5                   EXAMINATION
6  BY MR. TORRES:
7    Q    Mr. Gillick, I represent Mr. Bader and
8  Mr. Larivee for at least a few more minutes in the
9  federal case.
10        Tell me everything you know about how the
11 $10 million sales price was arrived at as of
12 January, let's say, 17th of 2008.
13        So from the time it got started,
14 negotiations, through the time that the sale was
15 consummated, tell me everything you recall that you
16 knew as to how that $10 million sales price was
17 arrived at.
18        MR. ZENDEJAS: Form, foundation.
19        MS. WHITE: Join.
20   A    Can you repeat the -- the dates you want
21 me to --
22   Q    (By Mr. Torres) Sure. Let's say November
23 of 2007 through January 18th of 2008, which would be
24 a few days after, I think, the purchase/sales
25 agreement was signed.

## Page 128

1    A    Okay.
2         MR. ZENDEJAS: Form, foundation.
3         MS. WHITE: Same.
4    A    Everything I know ...
5    Q    (By Mr. Torres) About how the $10 million
6  sales price was arrived at.
7    A    I don't have any facts. This is just
8  my -- I'm presuming things, and I don't have any
9  facts on -- I wasn't involved, so -- do you want
10 my --
11   Q    I want your personal knowledge right now.
12   A    My personal knowledge of how it was ... I
13 wasn't given any information by people that had
14 knowledge of how it was evaluated.
15   Q    Okay. Let me take the next time period.
16 From January 18th 2008 through, let's say,
17 December 31st of 2011, did you gain any personal
18 information as to how the $10 million sales price
19 was arrived at?
20        MR. ZENDEJAS: Same objections.
21        MS. WHITE: Objection. Form and
22 foundation.
23   A    Once again, I wasn't given directly by
24 anyone how -- except maybe our valuator.
25   Q    (By Mr. Torres) Who would that be, just